UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
RANDI WEINGARTEN, as President of the UNITED
FEDERATION OF TEACHERS, Local 2, American
Federation of Teachers, AFL-CIO, MIRIAM
DELMOOR, ANTHONY THOMPSON, and DAVID
PECORARO,

                Plaintiffs,

        -against-                                                  08 Civ. 8702 (LAK)

BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK, JOEL I.
KLEIN, as Chancellor of the City School District of the
City of New York, and THE CITY OF NEW YORK,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

    Appearances:

        Alan Klinger
        Dina Kolker
        STROOCK & STROOCK & LAVAN

        -and-

        Norman Siegel, Esq.
        *Attorneys for Plaintiffs*

        Paul Marks
        MICHAEL A. CARDOZO
        CORPORATION COUNSEL OF THE CITY OF NEW YORK
        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

Plaintiffs, the president of the United Federation of Teachers (the "UFT") and three New York City public school teachers, claim that two sections of the New York City school chancellor's Regulation D-130 (the "Regulation") violate their rights under the First Amendment and the New York State Constitution. Specifically, they contend that it impermissibly bars teachers from (1) wearing political campaign buttons in Board of Education ("BOE") buildings, (2) posting candidate political materials on bulletin boards designated for union use in BOE buildings, and (3) placing candidate-related political materials in staff mailboxes in BOE buildings. The matter is before this Court on plaintiffs' motion for a preliminary injunction seeking to enjoin enforcement of the offending sections of the Regulation.

*Facts*

Section C.1 of the Regulation, which has been in effect since at least 2004, provides, under the heading "Conduct of Officers and Employees" that, "[w]hile on duty or in contact with students, all school personnel shall maintain a posture of complete neutrality with respect to all candidates."

Section B.3.a, under the heading "Use of School Facilities and Equipment," provides:

"No material supporting any candidate, candidates, slate of candidates, or political organizations/committees may be distributed, posted, or displayed in any school building.

"a. Except as an integral part of regularly published staff newspapers or newsletters, materials advocating the election of a candidate or slate of candidates may not be placed in staff mailboxes in schools or district or central headquarters offices. However, in no event, shall regularly published staff newspapers or newsletters contain endorsements of community school board candidates. Inserts for the purposes of campaigning may not be included in regular publications placed in staff mailboxes in schools and district and central offices."

On or about September 23, 2008, the UFT sent an email to its chapter leaders providing guidance to members regarding the wearing of political buttons during school time, the hanging of posters on union bulletin boards, and the distribution of other political materials accompanying regular union distributions. Plaintiffs maintain that the UFT had sent the same notice to its members on other occasions, including during the previous two presidential elections.

Within a few days, Michael Best, general counsel to the chancellor, informed the UFT that the Regulation barred the wearing of campaign buttons and the distribution of any political materials. On or about October 1, 2008, the BOE followed up with an electronic notice to all school principals. It reminded principals of the importance of compliance with the Regulation in light of the upcoming presidential election and called specific attention to Sections B.3.a and C.1.

Plaintiffs DelMoor, Thompson, and Pecoraro maintain that the BOE's position has deterred them from wearing political buttons and/or displaying union campaign posters on designated union bulletin boards. They claim also that they all have worn campaign buttons, and witnessed others doing so in the past, without incident. I have no doubt that some teachers have done so on some occasions. The record does not persuade me that the practice was as widespread as plaintiffs would have it.

On Friday, October 10, 2008, plaintiffs applied for an order to show cause seeking a temporary restraining order and a preliminary injunction in reference to the enforcement of Sections B.3.a and C.1. On October 14, after argument on plaintiffs' application for a temporary restraining order, the parties notified the Court of their consent to having that hearing stand as the hearing on the application for a preliminary injunction. They agreed also that no further hearing on that application was necessary.

*Discussion*

A.  *Preliminary Injunction Standard*

The standard for granting a preliminary injunction is well established. The moving party must demonstrate: (1) irreparable harm in the absence of relief and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of the hardships tipping decidedly in their favor.[1] Moreover, where the moving party challenges "government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party must demonstrate irreparable harm and a likelihood of success on the merits.[2]

B.  *Threat of Irreparable Harm*

"[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[3] Accordingly, threatened or ongoing injuries to First Amendment rights satisfy the irreparable harm requirement.[4]

Here, plaintiffs claim that they already have been and, absent and injunction will be,

---

[1] *See Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004); *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004).

[2] *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996); *see also Million Youth March, Inc. v. Safir*, 18 F. Supp. 2d 334, 339 (S.D.N.Y.), *stay denied and injunction modified,* 155 F.3d 124 (2d Cir. 1998).

[3] *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

[4] *Id.*

prohibited by the challenged aspects of the Regulation from wearing political campaign buttons and from posting campaign materials. If and to the extent that this offends their First Amendment rights, they have satisfied the irreparable harm prong. Indeed, defendants' brief essentially concedes as much. As plaintiffs' challenge to the aforementioned sections of the Regulation is the type of challenge to government action discussed in *Jolly*, however, plaintiffs' motion is subject to the more stringent standard outlined in that case. Accordingly, the motion turns entirely on plaintiffs' likelihood of success on the merits.

C.  *Likelihood of Success on the Merits*

>   (1)  *Candidate Campaign Buttons*

Analysis of the question whether public school teachers have a First Amendment right to wear political campaign buttons in the classroom properly begins with *Pickering v. Board of Education*.[5] In that case, the plaintiff teacher had been fired by the local school board for writing a letter to a newspaper that was critical of the board and the school superintendent. The Supreme Court thus was called upon to reconcile "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[6] And it did so by holding that the First Amendment permits a public school to restrict a teacher's speech regarding matters of public concern only if the speech would harm the school's ability to operate efficiently or inhibit the

---

[5] 391 U.S. 563 (1968).

[6] *Id.* at 568.

teacher's ability to perform his or her job.⁷

*Pickering* was followed in the next term by *Tinker v. Des Moines Independent Community School District,*⁸ a case that crossed the threshold into the school building. The issue there was whether students had the right to wear anti-Vietnam war arm bands while in class. The Supreme Court there famously stated that students in the public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."⁹ Nevertheless, although it ultimately held that the wearing of the arm bands was constitutionally protected, it made clear that school authorities may regulate student expression within the school where they have reason to believe that such expression will "substantially interfere with the work of the school or impinge upon the rights of other students."¹⁰

The next and, in plaintiffs' view, final pertinent case was *James v. Board of Education of Central School District of the Town of Addison*.¹¹ *James* involved the suspension of a high school teacher for wearing a black arm band in protest against the Vietnam War. In concluding that the teacher's right to free speech had been violated, our Circuit applied *Pickering* to hold that "any limitation on the exercise of constitutional rights can be justified only by a conclusion, based upon

---

⁷  *Id.* at 572-73.

⁸  393 U.S. 503 (1969).

⁹  *Id.* at 506.

¹⁰  *Id.* at 509.

¹¹  461 F.2d 566 (2d Cir. 1977). *See also Russo v. Central School District No. 1 Towns of Rush*, 469 F.2d 623 (2d Cir. 1972). *cert denied*, 411 U.S. 932 (1973) (holding unconstitutional the firing of a high school teacher for failing to pledge allegiance to the flag during class).

reasonable inferences flowing from concrete facts and not abstractions, that the interests of discipline or sound education are materially and substantially jeopardized, whether the danger stems initially from the conduct of students or teachers."[12]

Plaintiffs invite me to hold that *Tinker, Pickering* and *James* require the conclusion that the wearing by teachers of political buttons in the classroom is protected by the First Amendment in the absence of proof that it would interfere materially and substantially with the public interests in discipline or sound education. They contend that there is no evidence in this record from which the Court properly could so find. But *Tinker, Pickering* and *James* are not the final word on the issue at hand.

In *Hazelwood School District v. Kuhlmeier,*[13] the issue was whether a public school principal had violated the First Amendment rights of students by insisting upon the removal from a newspaper written and edited as part of a high school journalism class of two pages containing articles that the principal found were inappropriate. And the Supreme Court approached that question from a perspective quite different from those by which it and the Second Circuit decided *Tinker, Pickering* and *James*. It began with the proposition that "'[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,' [citation omitted], rather than with the federal courts."[14] It reasoned that "school officials may impose reasonable restrictions on the speech of students, teachers, and other members

---

[12] *Id.* at 571.

[13] 484 U.S. 260 (1984).

[14] *Id.* at 267 (quoting *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 683 (1986)).

of the school community" unless the school facilities had become a public forum as a result of having been opened "for indiscriminate use by the general public."[15] Concluding that the school newspaper was not a public form, it held that "school officials were entitled to regulate [its] contents . . . in any reasonable manner" and that "this standard, rather than [its] decision in *Tinker,* . . . govern[ed the] case."[16] It then went on to draw a critical distinction between the type of personal student expression at issue in *Tinker,* "personal expression that happen[ed] to occur on the school premises," and speech that "members of the public might reasonably perceive to bear the school's imprimatur," such as the newspaper published as part of the journalism class.[17] "Educators," it ruled, "are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, *and that the views of the individual speaker are not erroneously attributed to the school."*[18] Accordingly, it held that "a school may refuse to lend its name and resources to the dissemination of student expression . . . [and that] educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."[19]

---

15
  *Id.* (quoting *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 47 (1983)).

16
  *Id.* at 270.

17
  *Id.* at 271.

18
  *Id.* at 272 (emphasis added).

19
  *Id.* at 272-73.

*Hazelwood* thus altered or, at least, rendered more complex the analysis that governs this case. Here, defendants' stated concern is the maintenance of neutrality in political campaigns, a concern that is born at least in part of a desire to avoid having the political expression inherent in the wearing of partisan political campaign buttons by teachers "erroneously attributed to the school."[20] And while plaintiffs argue that no reasonable person could conclude that the messages borne by teacher-sported buttons reflect the views of the Board of Education, the cases to have considered this question have applied *Hazelwood* to uphold public school actions identical or comparable to the button ban at issue here.

*California Teachers Association v. Governing Board of San Diego Unified School District*[21] is directly in point. The San Diego school district there prohibited teachers from wearing political campaign buttons at work during work hours. The teachers' union challenged the ban on First Amendment grounds. The California Court of Appeal began with *Hazelwood*'s observation that schools have a "great deal more authority" to regulate speech that could be perceived by members of the public as bearing the school's imprimatur than they do when regulating a student's personal expression.[22] It concluded that public school teachers, at least when teaching, and administrators act with the imprimatur of the school district and that, within the "intimate and deferential environment" of the classroom, "public school authorities may reasonably conclude it is not possible to both permit instructors to engage in classroom political activity and at the same time successfully disassociate

---

[20] *Id*. at 271.

[21] 53 Cal. Rptr. 2d 474 (1996).

[22] *Id*. at 478.

the school from such advocacy."[23] Indeed, the court reasoned that the very attributes of a successful student/teacher relationship make it reasonable for school officials to determine that restricting teachers from engaging in political advocacy during instructional activities is the only practical way to dissociate a school from political controversy.[24] Accordingly, it rejected the union's challenge to the button ban.

*California Teachers* is noteworthy here not only for its application of *Hazelwood* to the wearing by teachers of political campaign buttons in school. Implicit in its analysis is the court's deference to the school district's determination that the wearing of the buttons might be viewed as lending the imprimatur of the district to the wearers' views, a deference that is inconsistent with *James'* insistence on proof of a likelihood that teacher anti-war arm bands would be disruptive. And if there were any doubt on this score, it was removed by the California court's explicit rejection of *James* on the ground, among others, that the court in *James* "did not have the benefit of the Supreme Court's opinion" in *Hazelwood*.[25]

The recent decision in *Mayer v. Monroe Community School Corp.*,[26] while involving somewhat different facts, is essentially to the same effect. In that case, the school declined to renew the contract of a probationary elementary school teacher, allegedly because she took a political stance during a current events class. In rejecting her First Amendment challenge to that action, the Seventh

---

[23] *Id*. at 479.

[24] *Id*. at 479-80.

[25] *Id*. at 480.

[26] 474 F.3d 477 (7th Cir. 2007).

Circuit held that teachers have no "constitutional right to determine what they say in class," essentially because "the school system does not 'regulate' teachers' speech as much as it *hires* that speech."[27] Echoing *Hazelwood,* it added that "pupils are a captive audience," that "majority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination," and that "if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers."[28] It went on to reject *James* on the ground that it is "inconsistent with later authority and unpersuasive."[29]

*Mayer* of course is not identical to this case. The teacher's comments in the current events class there arguably deviated from or embellished upon the curriculum she was hired to teach whereas the relationship, if any, between the wearing of campaign buttons by teachers and the accomplishment of their instructional role in a manner satisfactory to their employer is more attenuated. The Seventh Circuit's view that *James* is unpersuasive, moreover, is not a basis upon which a district judge in the Second Circuit, however much in agreement with *Mayer* such a district judge might be, properly could decline to follow a binding Second Circuit decision.[30] And the Seventh Circuit's comments about indoctrination were unnecessary to the result. Nevertheless, *Mayer* is pertinent here.

*Mayer* and *California Teachers* together demonstrate that (1) the governing boards

---

[27] *Id.* at 479 (emphasis in original).

[28] *Id.* at 479-80.

[29] *Id.* at 480.

[30] I express no opinion as to this.

of public schools are constitutionally permitted, within reason, to regulate the speech of teachers in the classroom for legitimate pedagogical reasons, (2) the maintenance of neutrality on controversial issues is a legitimate pedagogical reason, and (3) *James* has been undermined seriously by more than three decades of subsequent decisions.[31] This case, in my view, therefore comes down to whether there is a reasonable connection between defendants' political button ban and political button ban and their legitimate pedagogical concern with the maintenance of neutrality.

There is no evidence in this record that would permit a finding, as a factual matter, that students and parents would view the wearing by teachers of political buttons in the classroom as carrying with it the imprimatur of the Board of Education upon the messages those buttons convey. In consequence, the case turns upon whether and to what extent defendants are entitled to deference on that issue or, instead, bear the burden of proving it as an empirical matter.

*Hazelwood*, strictly speaking, does not resolve this despite its statement that "'[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,' [citation omitted], rather than with the federal courts."[32] The student newspaper censored in that case was published as part of the school's journalism class. It obviously bore the school's imprimatur, so the quoted statement was unnecessary to the result. But even if the Court's statement were accepted as binding, often the wise course for lower courts in the case of considered *dicta* of the Supreme Court, the extent of the deference and the criteria for assessing a school board's determination would remain open issues. So the question in any case

---

[31] *See e.g., Silano v. Sag Harbor Union Free School Dist. Bd. of Educ.*, 42 F.3d 719 (2d Cir. 1994) (applying *Hazelwood* to uphold a school board's restrictions on instructional teacher speech inside the classroom).

[32] *Id.* at 267 (quoting *Bethel School Dist. No. 403,* 478 U.S. at 683).

would be whether the defendants' view that the opinions conveyed by teacher-worn political buttons "might reasonably [be] perceive[d] to bear the school's imprimatur" or otherwise interfere with the accomplishment of defendants' public role should control here.

While the question is not free from doubt, I conclude that it should. Our public schools are attended by students ranging from toddlers to 17- and 18-year olds whose range of intellect and sophistication spans the entire spectrum from very low to extremely high. We trust the chancellor and the Board of Education to understand the needs, capabilities and vulnerabilities of that population and to design and implement programs to teach the skills and knowledge required in life. We do so because defendants are expert in those matters. As an initial matter, therefore, their view is entitled to the respect commanded by expertise.

That is not to say that deference is blind. Any determination by school authorities that impinges on free expression is subject to judicial review. But that review must respect not only professional expertise where the determination rests, at least in part, on a judgment as to the manner in which particular activity may affect the students whom we entrust to the care of school boards, but also the sensitivity of the judgment to First Amendment values. In other words, school officials may not take a sledge hammer to freedom of expression and then avoid all scrutiny by invoking alleged professional judgment.

In this case, the Regulation is content-neutral, i.e., it is justified without reference to the content of the regulated speech. Teachers plainly have ample alternative channels for the communication of their views, especially given that there is nothing special about schools that make school venues intimately connected with the messages that the teachers wish to communicate.[33] And

---

33 *Cf. Million Youth March, Inc.*, 18 F. Supp.2d at 347-48.

plaintiffs have not suggested any less restrictive means by which the defendants could avoid the risk they perceive. While a majority of students, particularly older students, presumably would understand that the views expressed by their teachers' campaign buttons are personal rather than institutional, there is a clear relationship between the regulation and defendants' legitimate interests in avoiding both the inevitable misperceptions on the part of a minority and, perhaps even more important, in avoiding the entanglement of their public educational mission with partisan politics.

I do not suggest by this discussion that the Regulation must satisfy the criteria applied to determine the reasonableness of time, place and manner restrictions applied in public *fora,* the line of authority from which these considerations have been drawn.[34] The fact that it is, whether designedly or otherwise, sensitive to those criteria, however, has a bearing in determining the extent of the deference that the Regulation commands. It suggests, and I find for purposes of this motion, that the Regulation in this respect reflects a good faith judgment by the defendants in their professional capacities about the impact of teachers' political campaign buttons in the school rather than a covert attempt to favor one viewpoint over another or a willingness to paint with too broad a brush. In light of *Hazelwood* and its progeny, that is all that is required in these circumstances. I therefore hold that plaintiffs are unlikely to prevail on their claim the enforcement of the Regulation, insofar is it proscribes the wearing of political buttons by public school teachers while in school, offends the First and Fourteenth Amendments to the United States Constitution or the corresponding provision of the New York Constitution.

    *(2)    School Mailboxes and Union Bulletin Boards*

---

[34] *See id.* at 344-45.

Restrictions on speech on government property are evaluated under a forum analysis. The Supreme Court has identified three main categories of fora: (1) the traditional public forum; (2) the designated public forum; and (3) the non-public forum.[35] Traditional public *fora* are those properties such as streets, sidewalks, and parks that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."[36] The "designated" public forum is a non-public forum that the government has opened for all types of expressive activity. In both traditional and designated public *fora*, content-based exclusions of speech must be narrowly tailored to a compelling state interest to survive First Amendment scrutiny.[37] On the other hand, restrictions on speech within non-public *fora*, a category that encompasses all property not included in the other classifications, need be only reasonable and viewpoint neutral.[38]

The "limited" public forum, the creation of which in respect of the mailboxes and bulletin boards is disputed in this case, is a subset of the designated public forum category.[39] A limited public forum exists "where the government opens a non-public forum but limits the

---

[35] *Perry*, 460 U.S. 37, 44 (1983).

[36] *Id*. at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

[37] *Id*. at 45-46; *see also New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 129 (2d Cir. 1998).

[38] *Id*. at 46.

[39] *Hotel Employees & Restaurant Employees Union v. City of New York Department of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002).

expressive activity to certain kinds of speakers or to the discussion of certain subjects."[40] In a limited public forum, strict scrutiny applies only to restrictions on speech that come within the limited category for which the forum was opened.[41] Limitations on speech that fall outside the designated category need only be viewpoint neutral and reasonable to avoid running afoul of the First Amendment.[42]

It is within this constitutional framework that the parties hotly contest whether the teachers' mailboxes became a limited public forum because the Board allegedly opened those mailboxes for the exclusive and unrestricted use by the UFT. The parties likewise dispute the status of the union bulletin boards, which both sides agree have been opened to the union at least for the posting of "material dealing with proper union business."[43] At this preliminary stage of the proceedings, however, I need not reach the issue of the status of the mailboxes and bulletin boards. Based on the record before it, I find that plaintiffs have met their burden of demonstrating a likelihood of success even under the more lenient non-public forum standard.

The Regulation, as construed by the Chancellor,[44] permits the distribution through

---

[40] Examples of limited public *fora* include state university meeting facilities opened to student groups, *see Widmar v. Vincent*, 454 U.S. 263, 267 (1981), open school board meetings, *see City of Madison Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n.*, 429 U.S. 167, 174-176 (1976), city-leased theaters, *see Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555-56 (1975), and subway platforms opened to charitable solicitations, *see Young v. N.Y.C. Trans. Auth.*, 903 F.2d 146, 161-62 (2d Cir.), *cert. denied*, 498 U.S. 984 (1990).

[41] *Hotel Employees* at 545.

[42] *Id*. at 546.

[43] Defs.' Br. at 19.

[44] Klein Decl. ¶ 7.

teachers' school mailboxes of partisan political literature so long as that literature is an integral part of regularly published union newsletters or newspapers. I fail to see a permissible basis for distinguishing between political advocacy in union newsletters and in other campaign literature. Furthermore, the rationale offered by defendants – "leafleting" through the mailboxes might overwhelm a school's ability to review and distribute mail – does not appear on the record before me to be a reasonable justification for a blanket bar on the union delivering candidate-related materials in mailboxes that are not open to students.

Plaintiffs' position appears even stronger with regard to the restriction on posting materials on union bulletin boards where those boards are in areas closed to students. The parties agree that the union's collective bargaining agreement grants teachers and the union access to at least one bulletin board per school for the posting of material dealing with union business. As noted above, even if this type of bulletin board were considered a non-public, as opposed to a limited, public forum, the restriction on speech could stand only if it were reasonable. Defendants, however, offer nothing but the most general and vague rationale for prohibiting the posting of candidate-related materials on union bulletin boards, contending that the regulation is "intended to ensure that schools are not hampered in serving their intended purposes."[45]

Equally unconvincing as a rationale for this blanket restriction is the conclusory assertion that the restriction on bulletin boards is important for the "same pedagogical reasons" that apply to teachers wearing buttons in schools. Indeed, the rationale for restricting the wearing of partisan buttons by teachers in schools is entirely inapplicable to material posted on *teacher* bulletin boards out of sight of students. It does not meet even the more lenient standard for restrictions on

---

[45] Defs.'s Br. at 20.

speech in non-public fora required by the First Amendment.

*Conclusion*

Plaintiffs' motion for a preliminary injunction is granted to the extent that defendants are hereby enjoined, pending the determination of this action, from enforcing the Regulation to the extent that it prohibits (1) posting materials containing candidate-related political content on UFT bulletin boards located in areas closed to students and (2) placing materials containing candidate related political content in staff mailboxes. It is denied in all other respects. The foregoing constitute the Court's findings of facts and conclusions of law.

SO ORDERED.

Dated: October 17, 2008
Issued at: 1:45p.m.

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)